**FILED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

DEC - 2 2009

DAVID CREWS, CLERK

By _____ Deputy

**DODGE BROTHERS, INC.,**
**d/b/a DODGE'S STORES**                                    **PLAINTIFF**

**VS.**                                              **CASE NO.** 1:09CV288-AD

**PARK CITY GROUP, INC., AND**
**PRESCIENT APPLIED INTELLIGENCE, INC.**          **DEFENDANTS**

**JURY TRIAL REQUESTED**

## COMPLAINT FOR BREACH OF CONTRACT, FRAUD IN THE INDUCEMENT, NEGLIGENT MISREPRESENTATION, ATTORNEY FEES, RECISSION AND DECLARATORY RELIEF

**COMES NOW,** DODGE BROTHERS, INC., D/B/A DODGE'S STORES, and brings this Complaint for Breach of Contract, Fraud in the Inducement, Negligent Misrepresentation, Attorney Fees, Recission, and Declaratory Relief, against the parties named herein, and in support of this Civil Action would show the following:

A.
PARTIES

1.      The Plaintiff, DODGE BROTHERS, INC., D/B/A DODGE'S STORES (hereinafter referred to as "Dodge's Stores"), is a Mississippi corporation duly organized and existing under the laws of the State of Mississippi, qualified to do business in the State of Mississippi.

2.      The Defendant, PARK CITY GROUP, INC. (hereinafter referred to as "Park City Group"), is a Delaware corporation duly organized and existing under the laws of the State of Delaware, qualified to do business in the State of Mississippi,

which may be served through its registered agent, Edward L. Clissold, 3160 Pinebrook Road, Park City, Utah 84098.

3.     The Defendant, PRESCIENT APPLIED INTELLIGENCE, INC., (hereinafter referred to as "Prescient"), is a Delaware corporation duly organized and existing under the laws of the State of Delaware, qualified to do business in the State of Mississippi, which may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

4.     The Plaintiff herein, is informed and believes, and based thereon alleges, that each of the Defendants was the agent and/or employee of each of the Co-Defendants, and in doing the things herein alleged were acting within the scope of the authority of such agents and/or employees and with the permission and consent of their co-agents.

B.
JURISDICTION

5.     Jurisdiction is proper as it meets the requirements of 28 U.S.C. §1332 since there is complete diversity of citizenship between the Plaintiff and Defendants, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

6.     This is also a Complaint for Declaratory Judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201(a), and Rule 57 of the Mississippi Rules of Civil Procedure, seeking a determination of the respective rights of the parties herein.

2

C.
BACKGROUND

7.     Dodge's Stores is in the business of marketing petroleum products, convenience store operations and fast food operations. In 2005, Dodge's Stores was approached by Randy Fields and other directors and employees of Park City Group, who represented to Dodge's Stores that Park City Group could provide a software platform that would make Dodge's Stores more efficient.

8.     Specifically, Randy Fields and other directors and employees, acting within their authority and scope of their duties as directors of Park City Group, represented to Dodge's Stores that Park City Group was a financially strong, nationally recognized developer of patented computer software which had unique abilities and capacity to competently provide the products and services, including software and software license implementation and maintenance support for selected software including, Action Base, Action Form, Smart Hire, Score Tracker, Scheduler, Ready Reference, Interactive Tutor, Checkup, Time Meter, Action Board and Forecaster, along with consulting services, forms development and training. Park City Group represented that these products would make Dodge's Stores more efficient. Collectively, the software products and associated service contracts are hereinafter referred to as the "Software System Agreement".

9.     Park City Group represented to Dodge's Stores that it had provided the named software products to other convenience store gas station operations throughout the country.

3

10.     In reliance upon the representations made by Park City Group, Dodge's Stores entered into a series of contracts with Park City Group hereinafter collectively referred to as the "Software System Agreement".

11.     In reliance upon the representations made by Park City Group, Dodge's Stores executed a Software License Service Agreement and Software License Agreement Addendum establishing the total cost for the Software License Fee at $523,022.50. See License Agreement and License Agreement Addendum attached hereto as Exhibit "A".

12.     In addition to the above referenced Software License Service Agreement, Dodge's Stores entered into a "Consulting Services Agreement" and "Statement of Work" for an initial cost of $35,000.00 for additional "professional services". Consulting Services Agreement and Statement of Work attached hereto as Exhibit "B". The products and services were summarized by Park City Group in the "Acquisition and Implementation of Park City Group Software Solutions" prepared by Park City Group and attached hereto as Exhibit "C".

13.     Collectively, the Software License Service Agreement, and Consulting Service Agreement are part of the services and contracts hereinafter collectively referred to as the "Software System Agreement".

14.     Specifically, Park City Group represented that it could provide Real-Time updates from the Software System. Park City Group represented that the Scheduler along with Time Meter would provide real time updates of the date and time employees clocked in and clocked out. Likewise, Park City Group represented that the System would allow Dodge Stores to alert the store leaders if an employee was working

4

overtime. According to Randy Fields and Park City Group, this would allow Dodge's Stores to manage employee overtime hours. Park City Group represented that the real time updates were to take place in fifteen minute intervals which would also show the specific foods sales. Park City Group never delivered this real time updating product.

15.     Park City Group represented that it would be able to integrate its software system seamlessly with Dodge's Stores' existing time clock. Despite Dodge's Stores adjusting the manner in which its employees punched in and punched out at the request of Park City Group, the Defendant failed to provide any real time tracking of employee hours as represented by Park City Group.

16.     Park City Group represented that Action-Form would allow Dodge's Stores to have a paperless form system which was to increase the efficiency of communication throughout the stores. Specifically, Park City Group misrepresented the amount of time and effort that would be required on Dodge's Stores' part to develop the individual forms. Even after the individual forms were completed, Park City Group failed to integrate the forms into the payroll system and never delivered a workable Action-Form software platform.

17.     Likewise, Park City Group failed to provide the Smart Hire Software which was intended to work through a kiosk computer station in which a potential employee applicant could fill out an online application. The kiosk application system never worked. Usually, the kiosk system would take between five and twenty minutes to load the application, which the potential hire was to fill out. Most applicants got frustrated and simply walked off or told the store manager that the system was

5

broken. The hardware to run this kiosk computer station was purchased according to the dictates of Park City Group.

18.     Even for the very few employee applicants that were able to get through the laborious and time consuming process of filling out the online application, the information would sometimes be lost by the Park City Group System and the applicant would have to fill out a new paper application.

19.     Often times, Dodge's Stores was unable to print out the online application in the rare event that the application was completed before the software "froze up" or "crashed".

20.     Park City Group represented that it could provide the Scoretracker Software, which was, in fact, never delivered by Park City Group.

21.     Park City Group represented that it could provide the Ready-Reference Software, which was, in fact, never delivered by Park City Group.

22.     Park City Group represented that it could provide the Interactive Tutor Software, which was, in fact, never delivered by Park City Group.

23.     Park City Group represented that it could provide the Check Up Software, which was, in fact, never delivered by Park City Group.

24.     Park City Group represented that it could provide a software called Time Meter which was represented as a software package that would collect, compile and integrate time clock punches with the Scheduler and the Dodge's Stores' payroll system. Specifically, Time Meter would not integrate with Dodge's Stores' time clocks as represented by Randy Fields prior to Dodge's Stores entering into the Software System Agreement.

25.     In addition, Time Meter was never able to integrate with Dodge's Stores' payroll system. Park City Group misrepresented the ability of Time Meter in this respect.

26.     Park City Group never delivered a working form of the Scheduler software platform. Specifically, Dodge's Stores had numerous issues in retrieving actual sales data from the system. Whole days would be left out, individual sales were left out and the actual transaction amounts would be incorrect. Scheduler repeatedly failed to assign employees to open slots even though qualified people were available for that particular slot.

27.     Park City Group also misrepresented the ability of its Forecaster software platform which was represented to predict future sales based on past sales trends. Park City Group never delivered the Forecaster system.

28.     Park City Group represented that the data generated by the Park City Group System would be updated in "real time" when, in fact, the frequency of data updating was once a day (when it worked at all).

29.     Dodge's Stores timely paid Park City Group's invoices and patiently worked with Park City Group in an effort to make the Park City Group System work. Eventually, it became clear to Dodge's Stores that Park City Group had misrepresented itself and the goods and services it agreed to provide, and on July 29, 2009, Dodge's Stores provided written notice to Park City Group to suspend all services in that Park City Group had failed to produce a usable product. See correspondence attached hereto as Exhibit "D".

30.     As of July 29, 2009, Dodge's Stores has paid Park City Group approximately $508,953.06 for a software product that was never delivered and implemented.

### D.
### COUNT I

COMPLAINT FOR BREACH OF CONTRACT
AGAINST PARK CITY GROUP, INC. AND
PRESCIENT APPLIED INTELLIGENCE, INC.

31.     The Plaintiff utilizes the above statements of fact with respect to the Defendants.

32.     The Plaintiff has fully performed all of its obligations under the separate Software System Agreement attached in part as Exhibits A, B, C and D. Since the inception of the initial contract, Plaintiff has paid Park City Group and/or Prescient a sum in excess of $508,953.06 in licensing, software and service fees pursuant to the Software System Agreement attached hereto as Exhibits A, B and C, and has received little or no products or services in return for these fees. In addition to these compensatory damages, Plaintiff has suffered incidental damages in the amount of approximately $50,000.00 for labor and equipment costs associated with Dodge's Stores relationship with Park City Group. In addition, Plaintiff has suffered incidental damages for the amount of labor and travel in an amount to be determined at trial.

33.     Defendants, Park City Group, Inc. and Prescient Applied Intelligence, Inc. have materially breached the Software System Agreement by failing to competently and/or adequately discharge the duties and obligations contained therein.

8

34.     Defendants, Park City Group, Inc. and Prescient Applied Intelligence, Inc. have materially breached the Software System Agreement by failing and refusing to provide any of the software products and/or services they were required to provide pursuant to the Software System Agreement.

35.     Specifically, after entering into the Software System Agreement with Park City Group, Plaintiff learned that Park City Group, and subsequently Prescient, were ill-equipped to provide the software and consulting services per the Software System Agreement. In addition, Plaintiff discovered that Park City Group did not possess an adequate infrastructure with which to provide the contracted products and services it was required to provide under the Software System Agreement.

36.     As a result of the inadequate infrastructure, Park City Group's software platform created a nightmare for Plaintiff in that Park City Group lacked the necessary software systems to provide the contracted services. In addition, Park City Group also lacks an adequately trained staff to deliver the services and software as required under the Software System Agreement.

37.     Park City Group failed and refused to provide and/or deliver any of the contracted software products and related services.

38.     Overall, Park City Group has failed to provide the products and services as promised in the Software System Agreement. The software "products" that have been provided by Park City Group have required continued and additional monitoring and corrective costs by Plaintiff. Plaintiff has not received any benefit by reason of the Software System Agreement. Indeed, Park City Group's unworkable "products" have led to increased costs, increased administrative burdens and inadequate

productivity reporting and accounting. In short, Plaintiff did not receive the benefit of the bargain promised by Park City Group.

39.     On or about July 29, 2009, Plaintiff sent a "Notice Letter" to Park City Group and Prescient Applied Intelligence notifying Defendants of their default in the performance of their obligations under the Software System Agreement in material respects. Prior to this Notice Letter, Dodge's Stores worked tirelessly with Park City Group and gave Park City Group every chance to cure their defaults.

40.     As a direct and proximate result of the material breaches by Park City Group and Prescient of the Software System Agreement, Plaintiff has been damaged in an amount according to proof at trial, which, on information and belief, Plaintiff now believes to be in excess of $558,953.06 plus interest on these monetary damages at the highest lawful rate.

E.
COUNT II

FRAUD IN THE INDUCEMENT

41.     The Plaintiff utilizes the above statements and allegations as though fully set forth herein.

42.     The representations by Randy Fields and Park City Group, Inc. were made knowingly on behalf of Park City Group, Inc. with the intent to induce Dodge's Stores to enter into the Software System Agreement.

43.     The representations by Randy Fields and other employees of Park City Group, as set forth above in Paragraph C Background were untrue.

44.     Said representations were material to Dodge's Stores' decision to enter into the Software System Agreement.

45.     Randy Fields and the Directors and employees of Park City Group knew the representations were false or made the representations without believing them to be true and without knowing whether they were true or false.

46.     Randy Fields and the Directors and employees of Park City Group made the representations with the intention that Dodge's Stores rely upon the representation.

47.     The Plaintiff, Dodge's Stores, reasonably and justifiably relied upon the representations as they had no reason to believe the representations were not true.

48.     In relying on the representations, Plaintiff was induced to enter into the Software System Agreement. Had Plaintiff known the true facts, it would not have entered the Software System Agreement.

49.     As a direct and proximate result of the fraudulent actions by Park City Group and Prescient of the Software System Agreement, Plaintiff has been damaged in an amount according to proof at trial, which, on information and belief, Plaintiff now believes to be in excess of $558,953.06 plus interest on these monetary damages at the highest lawful rate.

F.
COUNT III

NEGLIGENT MISREPRESENTATION

50.     The Plaintiff utilizes the above statements and allegations as though fully set forth herein.

51.     Park City Group failed to exercise ordinary care in making the representations set forth in the Background Paragraph C herein. Regardless of what Park City Group actually believed, it made the representations without any reasonable grounds for believing that the representations were true.

52.     Plaintiff was not aware that the representations were untrue.

53.     As a direct and proximate result of Park City Group's negligent representations, Plaintiff has suffered actual damages in the amount of $558,953.06.

G.
COUNT IV

RECISSION, BREACH OF CONTRACT,
FAILURE OF CONSIDERATION

54.     The Plaintiff utilizes the above statements and allegations as though fully set forth herein.

55.     Since the inception of the Software System Agreement, Plaintiff has paid periodic service fees, maintenance fees and licensing fees in excess of $508,953.06. In addition to these compensatory damages, Plaintiff has suffered incidental damages in the amount of approximately $50,000.00, plus incidental damages in the amount to be determined at trial.

56.     In return for the payment of such fees, Plaintiff was entitled to the services specifically set forth in Paragraph C above. However, Defendants have never been capable of rendering such services in a reasonably competent and satisfactory manner. As a result of Defendants' failure to perform, there has been a material breach of the Software System Agreement and a total failure of consideration.

57.     Despite Plaintiff's repeated demands that Defendants perform in accordance with the Software System Agreement, Defendants have failed and refused to develop and implement software forms and services which would, at least in part, enable Defendants to perform their obligations under the Software System Agreement.

58.     Plaintiff intends that the service of the summons and complaint in this action serve as notice of recission of the Software System Agreement, and Plaintiff hereby offers to restore all software platforms and applications furnished by Defendants, on the condition that Defendants restore to Plaintiff the consideration furnished by Plaintiff, specifically, approximately $508,953.06 paid by Plaintiff in service fees, license fees and consulting and maintenance fees.

H.
COUNT V

ATTORNEY FEES

59.     The Plaintiff utilizes the above statements and allegations as though fully set forth herein.

60.     The representations made by Randy Fields and Park City Group, Inc. were made knowingly on behalf of Park City Group, Inc. were false or were otherwise made without the representative's knowledge whether they were true or false.

61.     Pursuant to the License Agreement, Paragraph 10.1, the prevailing party in any legal action is entitled to recover reasonable attorney fees and costs. As such, the Plaintiff has incurred attorney fees and will incur attorney fees in the future in an amount to be determined by the trier of fact upon proof offered at trial.

13

62.     As a direct and proximate result of the above referenced counts, Plaintiff has been damaged by incurring attorney fees in an amount to be determined by the trier of fact upon proof offered at trial, together with any additional pre-judgment or post-judgment interest at the highest lawful rate and all costs of Court, for all of which execution may issue. Plaintiff prays for general relief.

I.
## COUNT VI

### DECLARATORY RELIEF

63.     The Plaintiff utilizes the above statements and allegations as though fully set forth herein.

64.     An actual controversy exists between Plaintiff, on the one hand, and Park City Group, on the other. Plaintiff contends that Park City Group is in material breach of its obligations under the Software System Agreement. On information and belief, Park City Group contends otherwise. Plaintiff contends that by reason of the material breach, which remains uncured after Plaintiff's repeated notice of the material breach, Plaintiff is entitled to terminate the Software System Agreement.

65.     Plaintiff requests declaratory relief from this Court declaring (1) that Park City Group and Prescient have materially breached their obligations under the Software System Agreement; (2) that Plaintiff has lawfully terminated the Software System Agreement; (3) that Plaintiff owes no additional money to Defendant; and, (4) Plaintiff is owed a return of all monies paid to Park City Group.

**WHEREFORE PREMISES CONSIDERED**, Plaintiff demands judgment against the Defendants in the amount of $508,953.06, with incidental and

14

actual damages in the amount of $50,000, and punitive damages, together with any additional pre-judgment and post-judgment interest at the highest lawful rate, reasonable attorney fees, and all costs of Court, for all of which execution may issue. Plaintiff prays for general relief.

Respectfully submitted, this the _____ day of December, 2009.

_____
MICHAEL B. GRATZ, JR., MSB #10672

Gratz & Gratz, P.A.
312 North Green Street
Tupelo, MS 38804
(662) 844-5531 (Phone)
(662) 844-8747 (Fax)

Attorneys for Dodge's Stores

**STATE OF MISSISSIPPI**

**COUNTY OF LEE**

      Personally appeared before me, the undersigned authority in and for the said County and State on this _____ day of December, 2009, within my jurisdiction, the within named **NAT LEATHERS**, known to me to be the Senior Vice-President of **DODGE BROTHERS, INC., D/B/A DODGE'S STORES,** who acknowledged that he signed and delivered the above and foregoing instrument on the day and year therein mentioned, acting in his official capacity, as the act and deed of said corporation, being fully authorized so to do by corporate resolution and that all matters and allegations and facts contained therein are true and correct as therein stated.

                                     _____
                                     NAT LEATHERS, Senior Vice-President
                                     Dodge Brothers, Inc., d/b/a Dodge's Stores

      SWORN TO AND SUBSCRIBED BEFORE ME, this the _____ day of December, 2009.

                                 _____
                                 NOTARY PUBLIC

(SEAL)

MY COMMISSION EXPIRES:

05-17-2010

16

Jul 22 05 04:06p        Randg Fields

Jul 22 05 03:56p

# LICENSE AGREEMENT

**Licensor**

PARK CITY GROUP, INC.
P.O. BOX 5000
PARK CITY, UTAH 84060
ATTN: RANDALL K. FIELDS

**Licensee**

SAVINGS STATIONS/DODGE'S STORES
447 East Main Street, P.O. Drawer 1688
Tupelo, MS 38802-1688
ATTN: THOMAS L. FAUST

| Software | License Fee |
|---|---|
| ActionBase, ActionForm, SmartHire, ScoreTracker | $ 174,285.00 |
| For 58 locations | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total Location License Fee** (A) | $174,285.00 |
| **Field Manager License Fee @ $ 300.00 x 14 users** | $4,200.00 |
| **Corporate Users ( no charge)** (B) | |
| **Total License Fee** (A+B) | $ 178,485.00 |

We grant, and you accept, a perpetual (unless terminated as provided herein), non-exclusive and nontransferable license to use the Software listed above, subject to all the terms of this License. The Total Amount Due is invoiced and payable 50% upon execution of this License, 25% within 30 days following delivery of the Software and the remaining 25% within 30 days of the completion of product training. Maintenance services commence after expiration of limited warranty service and are renewable for consecutive 12 month periods upon payment of an annual maintenance fee equal to 18% of the Total License Fee for all licensed modules, for the first year, and 18% of the Total License Fee identified in this agreement for subsequent years, in advance, in full, without deduction or offset. If you cancel and later desire to resume our maintenance services, you will, as a condition to resumption, pay us all maintenance fees that would have been due from the date of cancellation to the date of resumption, as if you had not cancelled our services. You will reimburse us for all charges that we incur in computer-to-computer communications and for travel, accommodations and other reasonable out-of-pocket expenses for all services performed outside of Park City, Utah.

The Software is licensed, not sold. We will deliver the current edition of the Software at a mutually agreed time. The Software that we deliver will have tested free of computer viruses using commercially available virus detection software. This License is effective only upon our acceptance and execution.

Licensee:
**SAVINGS STATIONS/DODGE'S STORES**

By: _Thomas L Faust_
Name: THOMAS L FAUST
Title: VICE PRESIDENT
Date: 7.22.05

Licensor:
**PARK CITY GROUP, INC.**

By: _____
Name: RANDALL FIELDS
Title: CHAIRMAN
Date: 7/22/05

[Continued on reverse side]

(C) 32,127.30   12/30/05

PAID 89,242.50
(A) 7/26/5
(B) 10/14/ 44,621.25

# CONSULTING SERVICES AGREEMENT

**Licensor**

PARK CITY GROUP, INC.
P.O. BOX 5000
PARK CITY, UTAH 84060
ATTN: RANDALL K. FIELDS

**Licensee**

SAVINGS STATIONS/DODGE'S STORES
447 East Main Street, P.O. Drawer 1688
Tupelo, MS 38802-1688
ATTN: THOMAS L. FAUST

| Description | Cost |
|---|---|
| Professional Services (consulting fees associated with project management, software tailoring, training and deployment assistance as described in the attached Statement of Work) | $35,000.00 |
| | |
| **Total Cost** | $35,000.00 |

Services are as described in the Statement of work attached. Payment is due 50% upon the signing of the agreement and the remaining 50% or $17,500.00 due thirty days after the completion of the product training.

**Client:**
SAVINGS STATIONS/DODGE'S STORES

By: _Thomas B. Faust_
Name: _Thomas L. Faust_
Title: _Vice-President_
Date: _7.22.05_

**Consulting Provider:**
PARK CITY GROUP, INC.

By: _____
Name: _Randall Fields_
Title: _Chairman_
Date: _7-22-05_

Paid
7/26/ 17,500

D & H                    T   16628423644           Dec   9         9:51 No.001 P.02

# Addendum No. 1

**PARTIES:**

**Licensor**

PARK CITY GROUP, INC.
P.O. BOX 5000
PARK CITY, UTAH 84060
ATTN: RANDALL K. FIELDS

**Licensee**

Savings Stations/Dodge's Stores
447 East Main Street, P.O. Drawer 1688
Tupelo, MS 38802-1688
ATTN: THOMAS L. FAUST

**UNIDERLYING AGREEMENT:**

License Agreement dated July 22, 2005 between Licensor ("PCG") and Licensee (as supplemented and mended from time to time)

**AGREEMENT:**

1) THIS ADDENDUM NO. 1 is made with reference to, supplements and is a part of the Underlying Agreement. Except as modified by this Addendum, the terms of the Underlying Agreement are unamended and in full force and effect, and will apply to the subject matter hereof. If any terms of this Addendum conflict with the Underlying Agreement, the terms of this Addendum will govern and the conflicting terms of the Underlying Agreement will be deemed modified to be consistent herewith. Capitalized terms used but not defined herein have the meanings given them in the Underlying Agreement.

2) Licenses are hereby granted as follows:

| Software | | License Fee |
|---|---|---|
| ReadyReference, InteractiveTutor, CheckUp, TimeMeter, ActionBoard, Scheduler and Forecaster | | $ 217,300.00 |
| For 58 locations | | |
| | | |
| | | |
| **Total Location License Fee** | **(A)** | $217,300.00 |
| **Corporate User License Fee (at no charge)** | **(B)** | $0.00 |
| Professional Services (consulting fees associated with project management, software tailoring, training and deployment assistance)  X1 X2 X3 X4 | | $127,237.50 |
| **Total License Fee** | **(A+B + Professional Services)** | $ 344,537.50 |

3) Payment Terms:

The Total Location License Fee is invoiced and payable 50% upon execution of this Addendum No. 1 License, 25% within 30 days following the delivery of the software and the remaining 25% upon installation in the first store. Professional services will be billed separately based on hours of effort completed and are due and payable with 30 days of invoicing. All other provisions will remain as defined in the underlying agreement.

① X1 X5 108,650.00
3/24/66
② 54,725.00

I & H                     16628423644          Dec    15    9:32 No.001 P.03

This Addendum is effective only upon Licensor's acceptance and execution.

Licensor                                    Licensee
PARK CITY GROUP, INC.                       Savings Stations/Dodge's Stores

BY: _____                 BY: _____

NAME: William D Dunlavy                      NAME: THomas L. Faust

TITLE: CFO                                   TITLE: VICE PRESIDENT

DATE: 12/27/05                               DATE: 12-22-05

# CONSULTING SERVICES AGREEMENT

**Licensor**

PARK CITY GROUP, INC.
P.O. BOX 5000
PARK CITY, UTAH 84060
ATTN: RANDALL K. FIELDS

**Licensee**

SAVINGS STATIONS/DODGE'S STORES
447 East Main Street, P.O. Drawer 1688
Tupelo, MS 38802-1688
ATTN: THOMAS L. FAUST

| Description | Cost |
|---|---|
| **Professional Services** (consulting fees associated with project management, software tailoring, training and deployment assistance as described in the attached Statement of Work) | $35,000.00 |
| | |
| **Total Cost** | $35,000.00 |

Services are as described in the Statement of work attached. Payment is due 50% upon the signing of the agreement and the remaining 50% or $17,500.00 due thirty days after the completion of the product training.

**Client:**
SAVINGS STATIONS/DODGE'S STORES

By: _Thomas D-Faust_
Name: THOMAS L. FAUST
Title: VICE-PRESIDENT
Date: 7.22.05

**Consulting Provider:**
PARK CITY GROUP, INC.

By: _____
Name: RANDALL FIELDS
Title: Chairman
Date: 7-22-05



## Statement of Work

Park City Group's consulting services team will perform the appropriate services for the implementation of the software designated in this agreement in four (4) test locations to be designated by Savings Stations/Dodge's Stores.

The professional services will include the following activities:

- Delivery of Before You Begin Worksheets to be completed by Dodge's Stores

- A project kick-off meeting at the Dodge's Stores Corporate location

- Project plans with milestones and deliverables to be created by the joint Dodge's Stores implementation team and Park City Group professional services teams.

- Timely status reports on project progress to Dodge's Stores management (project management and executive management)

- Implementation team training on modules to be implemented

- Initial rules definition and preliminary Scheduler application tailoring for the four (4) test stores (the hours to be accumulated and applied against the next phase services)

- Assistance in the development of training for the location, field and corporate management

- Training and assistance to the Dodge's Store staff for the tailoring of forms and ScoreTracker views to be used in the test locations

- Assistance in analyzing form usage and recommendations to be provided to help streamline processes and re-engineer form usage



F INAL

# Phase Acquisition and Implementation of
# Park City Group Software Solutions
# for
# Dodge Stores

Based on both our telephone and in person conversations, we believe there is significant synergy between the Dodge Stores organization and Park City Group, specifically as it relates to the alignment of our business philosophies. Our discussions have identified a number of different opportunities that are part of the Dodge Stores' operational improvement plans where the technologies offered by Park City Group can significantly expedite implementation and the resulting improvements to customer satisfaction, store manager workload while delivering a return on investment.

While Park City Group has technology solutions to address the previously identified opportunities, we are recommending a phased approach of addressing operational issues. Using the crawl-walk-run methodology to best ensure user acceptance, operational improvement success, and return on investment in a timely manner.

**Phases Defined:** We are recommending phase contents based on the following criteria:
- Operational improvement by reducing the workload of the store leaders
- Operational improvements by reducing the workload of corporate resources
- Minimized impact on the technology initiatives already in progress
- Demonstration of the company's commitment to the goal of improving the customer experience

Phase 1: Improving workflow and workforce processes for store leaders
This phase includes the implementation of the foundation to the applications (ActionBase) with the addition of automating the paper forms processing (ActionForm) and providing a more automated and efficient workforce hiring process (SmartHire). Information access and visibility of key business indicators throughout the organization will be made available through the implementation of ScoreTracker.

Phase 2: Increasing store leader productivity
This phase continues to provide store leaders and corporate managers with additional information upon which to make key business decisions. Included in this phase is the improved distribution of policy and procedure manuals (ReadyReference) and integrated computer based training and testing (InteractiveTutor and CheckUp). A new dashboard that delivers information to the store leaders, field managers and corporate managers will be made available (ActionBoard) and implementation of an integrated time and attendance (TimeMeter) and labor scheduler (Scheduler) will provide significant support to store leaders in addressing some of the most time consuming tasks that are part of their responsibilities. Of course, each of these applications will be integrated with the other applications already implemented.





Phase 3: <u>Improving customer satisfaction and profitability through fresh item management</u>
Three applications compose this phase of the operational improvement plan. Simplifying the data gathering and reporting from the POS devices can be simplified and automated (CashSheet). Fresh item management will become a more automated process, including the automation of ordering, the implementation of a perpetual inventory, management of shrink and waste and recommended production times and quantities to match the customer demand (Fresh Market Manager).

**Implementation:** The scope of any implementation will be significantly influenced by the type of implementation project Dodge Stores wishes to deploy. Park City Group can offer a number of different types of resources and implementation projects based on the mix and amount of participation by Dodge Stores staff and Park City Group consultants.

Some of the types of resources and services that Park City Group can provide are:
<u>Operational consultation</u> – providing operational experience and best practices advice from Park City Group senior management to the management team of Dodge Stores.
<u>Project Management (ownership or advisory)</u> – Park City Group can provide a project manager that will develop and oversee the project plan, milestones, reporting and validation for the project phase. If desired, Park City Group can provide the project management consulting in an advisory capacity for the designated Dodge Stores project manager.
<u>Task/Execution Consultants</u> - Park City Group consultants can perform the analysis and development of specific deliverables (i.e., review the existing forms used at Dodge Stores, recommend the capabilities of form improvement, execute the form development and train the Dodge Stores team on its use and how to adjust or change it.)

We will recommend that the scope of the implementation services needed will be more specifically defined, documented and agreed upon during the initial project meetings. For a baseline of services costs, we will provide a range of anticipated services in this proposal.

**Software Licensing:** The standard pricing for a company with less than 100 locations was used in these calculations. We have separated the product pricing by the different phases and based on calculations on 58 stores in the Dodge Stores and Savings operations. There is a segment of each application that resides at the corporate office and those pieces have been included in the pricing. An ASP (Application Service Provider) option can be quoted at Dodge Stores' request.

**Phase 1 – Workflow and Workforce Improvements**
(ActionBase, ActionForm, SmartHire, ScoreTracker)

Software:          $174,285

**Phase 2 – Increasing Productivity**
(ReadyReference, InteractiveTutor, CheckUp, TimeMeter, ActionBoard, Scheduler)

Software:          $159,750

**Phase 3 – Improved Profitability and Fresh Item Management**
(CashSheet, Fresh Market Manager)

Software:          $225,715

---

As a demonstration of our confidence in our ability to meet your business requirements, we will complete the interfaces necessary to obtain information and provide a database of information gathered from the stores at the corporate office at no charge to Dodge Stores.

---

Note: licensing options have an annual maintenance fee of 18% of the then current software price.

**Professional Services:** As previously mentioned, the professional services costing can only be formalized based on the amount, timeline and types of services.

It should be noted that we are able to discount the services offering should an implementation be initiated by mid-July, 2005. After July 15, 2005 the September, 2005 pricing listed below will be valid for a decision made before December 31, 2005.

We will make the following assumptions in order to provide an estimate of the services by phase: (1) Dodge Stores will use advisory project management support and that (2) Dodge Stores will use a larger amount of task activity consulting work in the initial part of each phase.

The following assumptions are being used to calculate the services by phase – (1) Park City Group has defined those activities and number of hours that are reasonable for initial implementation of the selected products by phase and (2) The services identified are those that are specifically related the initial implementation of the product. These include – initial project kickoff meeting, Before You Begin worksheet completion and evaluation, product training and tailoring, train the trainer, task execution testing and deployment assistance into the first location and (3) the phase 3 pricing is representative of only the food service portion of the business as the remaining items have yet to be fully enabled for scanning.

|  | # of Hours | July, 2005 | September, 2005 |
|---|---|---|---|
| Phase 1 – Services | 700 | $35,000 | $ 70,000 |
| Phase 2 – Services | 1170 | $58,500 | $117,000 |
| Phase 3 – Services | 1260 | $63,000 | $126,000 |

Additional hours may be added at a rate of $125.00 per hour to any phase either in July or September's pricing model.

**Summary:** While not all variables associated with this implementation have been fully defined there is a high level of confidence that the Dodge Stores and Park City Group teams successfully implement the solutions and achieve the desired results. At each phase of the project, as well as throughout the entire project, we will deliver solutions and evaluate the efficacy of those solutions in meeting the business goals of Dodge Stores. Our successful convenience store operations experiences gives us a high level of confidence that we can provide the benefits that Dodge Stores is seeking and more importantly, we look forward to developing a strong relationship with Dodge Stores because we want to make sure you consider us to be your business partner rather than just your software vendor.

7/29/09

Randy Fields

Randy,

This letter is notification that we wish to suspend all services from Park City Group effective immediately. As you are aware we have been working on our project for at least four years and we still do not have a usable product. There are many reasons why we have not gotten a scheduler that will work for our stores, but the bottom line is we have spent $495,000 and countless hours of our time and still do not have anything for a return on our investment. At this point in time we are not going to invest any more of our time or money into a project that is already years behind schedule and is not likely to give us the return on investment that was indicated when we signed the contract. I regret that it has come to this, but we must focus our energies in areas that we can get a return on our investment.

Sincerely,

Nat Leathers

